614 So.2d 1086 (1993)
John FALK, Appellant,
v.
Thomas M. BEARD, etc., et al., Appellees.
No. 79676.
Supreme Court of Florida.
March 4, 1993.
*1087 David A. Lamont of Bacon, Bacon, Johnson, Goddard & Lamont, P.A., St. Petersburg, for appellant.
Robert D. Vandiver, General Counsel and Cynthia B. Miller, Associate General Counsel, Florida Public Service Com'n, Tallahassee, and C. Everett Boyd, Jr. of Ervin, Varn, Jacobs, Odom & Ervin, Tallahassee, on behalf of H. Geller Management Corp., for respondents.
PER CURIAM.
We have for review final Order No. 25234 of the Florida Public Service Commission (PSC), rendered on October 18, 1991. We have jurisdiction. Art. V, § 3(b)(2), Fla. Const.
This case involves the management fee charged for the common elements in the Terrace Park condominium community. The PSC order denied John Falk, a resident of the condominium community, relief from a management fee imposed by Geller Management Corporation (Geller) geared to a cost-of-living adjustment. The PSC found that the escalation clause in Geller's contract with condominium owners, based on increases in electric utility rates,[1] was a cost-of-living adjustment and not a sale of electricity. The PSC also found that Geller was not a utility engaged in the sale of electricity. Falk challenges these conclusions.
We agree that the electricity provided to the common areas of the condominium was an incidental part of Geller's contract to provide services and facilities.[2] The PSC found:
Geller Management doesn't supply electricity  it supplies services and facilities which require the company to use and pay for electricity. It is the management company's obligation to provide these services and inherent in the provision of these services is the fact that electricity is needed. Geller does not supply electricity to the ultimate consumer and the ultimate consumer is unable to choose how the electricity is used. This is not a sale of electricity to the ultimate consumer. Rather, this is a provision of services, with the price of these *1088 services being indexed to the price of electricity.
From a common sense standpoint Geller is not an electric utility engaged in the sale of electricity. The contract that was entered into between Geller and the condominium owners is one which contains an indexing procedure for the pricing of services.
Order at 3. Our review of findings of the PSC is limited to consideration of whether the order is supported by competent, substantial evidence. Jacksonville Suburban Utils. Corp. v. Hawkins, 380 So.2d 425 (Fla. 1980). The PSC conducted a full evidentiary hearing on the complaint in this case. Geller testified that the reason utility rates were chosen as a benchmark of inflation was because utility rates do not fluctuate as often as other indices. In support of the PSC order, the record reflects that Geller bears the burden of increased expenses that fall short of the amount triggering the fee increase. There was no separate charge for the use of recreational facilities or the electricity attendant upon use of the facilities, nor was the fee tied to the amount of electricity consumed. The PSC, after hearing the evidence, interpreted the contract between Geller and the condominium owners as one not for the sale of electricity, but rather for the provision of a bundle of services, with the provision of electricity to the common areas merely one facet of such services. The PSC's order is supported by competent substantial evidence in the record and we therefore affirm it.
Falk nevertheless argues that the PSC's conclusion contradicts Fletcher Properties, Inc. v. Florida Public Service Commission, 356 So.2d 289 (Fla. 1978). We find Fletcher distinguishable. Fletcher wanted to install individual meters in single-family homes, thus supplying water to the ultimate consumer, and wanted to charge for the water based on actual consumption. The instant case involves common areas only, not individual units. The increase here was triggered not by increase in consumption but by increases in the cost of electricity per kilowatt hour. Fletcher moreover intended to provide water to all individuals in a given area, including those with whom it had no other exiting relationship  it was a plain and simple sale of utility service to the general public.
Falk also challenges the PSC's interpretation of Rule 25-6.049, Florida Administrative Code. The PSC determined that the rule's purpose is to mandate the use of individual meters in occupancy units such as condominium units, apartments, stores, and shops in shopping centers and malls.[3] The PSC determined that the rule *1089 is not intended to apply in this setting where units are separately metered and residents pay Florida Power Corporation directly for the electricity used in their individual units. The PSC interpreted this rule as applying only to occupancy units and not to common areas of condominiums.[4] The construction of a rule by the agency charged with its enforcement and interpretation is entitled to great weight. Courts should not depart from that construction unless it is clearly erroneous. PW Ventures, Inc. v. Nichols, 533 So.2d 281 (Fla. 1988). We cannot say that the instant interpretation is erroneous or unauthorized.
In an earlier appearance of the parties before the Court, we held that the circuit court lacked jurisdiction to enjoin the PSC from reviewing Falk's complaint against Geller. Florida Pub. Serv. Comm'n v. Bryson, 569 So.2d 1253 (Fla. 1990). In that proceeding the PSC took the position that it had jurisdiction because, among other things, its rule and the Fletcher case applied to Geller. Falk argues that it is unlawfully arbitrary for the PSC to now conclude that the rule and Fletcher are inapplicable. On the contrary, it is clear to us that the PSC was merely asserting its jurisdiction to investigate a complaint alleging that Geller was selling electricity. We agree with the PSC that after this Court determined that the PSC had jurisdiction to investigate the complaint, the PSC was obligated to provide a complete review of the complaint and could not merely rubber-stamp its preliminary conclusion that a violation of its governing statutes and rules existed. A rubber-stamping of its preliminary conclusion would have reduced the hearing to a mere sham  a denial of due process. After a full evidentiary hearing on the matter, including the testimony of Geller and Charles Parmelee, an expert in the field of electric utility rates, the PSC concluded that no violation had occurred. Falk argues that the testimony of Geller cannot support the PSC's decision because it is self-serving. We disagree. It would be an anomalous situation indeed if the testimony of the one against whom a complaint is lodged could never form the basis for competent, substantial evidence.
Accordingly, we affirm the order of the PSC under review.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] The contract provided:

The monthly maintenance fee for each condominium parcel owner shall be increased as provided for hereinafter to represent increases for public utilities... . The increases shall be according to the following schedule for the duration of the contract:
... .
(d) Electricity: In the event that Florida Power Corporation, which is presently furnishing electricity to the said condominium units, increases its rates per KWH by an amount equal to five percent (5%) of the rate per KWH being charged as of the first day of January 1980, such increase will be apportioned among the condominium units by the addition to the monthly maintenance fee, beginning with the month following such increase, the sum of $15.00 to be paid by the Association, which sum shall be proportioned to each unit owner predicated upon each unit owners' percentage of ownership of the common elements as set forth herein. There shall be no increase in the amount of the management fee for this increase. For each increase of the rate per KWH equaling five percent (5%) made by the said Corporation, the maintenance fee shall be increased as hereinabove set forth.
[2] The contract requires Geller to provide insurance on the buildings and grounds, gas for cooking in and heating of individual units, water, sewer, lawn and grounds maintenance, TV antenna service, garbage collection, maintenance of exteriors and roofs of buildings and common areas, elevator maintenance, electric service to common areas and facilities, recreational facilities, including pools, shuffleboard courts, billiard rooms, saunas and steam rooms, meeting rooms, recreational halls, and kitchen facilities.
[3] Rule 25-6.049, Florida Administrative Code, provides:

Measuring Customer Service.
(1) All energy sold to customers, except that sold under flat rate schedule, shall be measured by commercially acceptable measuring devices... .
(2) When there is more than one meter at a location the metering equipment shall be so tagged or plainly marked... .
(3) Meters which are not direct reading shall have the multiplier plainly marked... .
(4) Metering equipment shall not be set "fast" or "slow"... .
(5)(a) Individual electric metering by the utility shall be required for each separate occupancy unit of new commercial establishments, residential buildings, condominiums, cooperatives, marinas, and trailer, mobile home and recreational vehicle parks for which construction is commenced after January 1, 1981. This requirement shall apply whether or not the facility is engaged in a time-sharing plan. Individual electric meters shall not, however, be required:
1. In those portions of a commercial establishment where the floor space dimensions or physical configuration of the units are subject to alteration...;
2. For electricity used in ... back up service to storage heating and cooling systems;
3. For electricity used in specialized-use housing accommodations such as hospitals ...;
4. For separate, specially-designated areas for overnight occupancy at trailer, mobile home and recreation vehicle parks where permanent residency is not established and for marinas... .
(b) For purposes of this rule [definitions follow]....
(6)(a) Where individual metering is not required under Subsection (5)(a) and master metering is used in lieu thereof, reasonable apportionment methods, including sub-metering may be used by the customer of record or the owner of such facility solely for the purpose of allocating the cost of the electricity billed by the utility.
(b) Any fees or charges collected by a customer of record for electricity billed to the customer's account by the utility, whether based on the use of sub-metering or any other allocation method, shall be determined in a manner which reimburses the customer of record for no more than the customer's actual cost of electricity.
(7) Each utility shall develop a standard policy governing the provisions of sub-metering as provided herein. Such policy shall be filed by each utility as part of its tariffs. The policy shall have uniform application and shall be nondiscriminatory.
[4] The PSC can regulate common areas under its general statutory powers, or by promulgation of an appropriate rule.